SCANNED

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| JOEL ROSEN, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>TEXTRON, INC., LEWIS B. CAMPBELL, JOHN A. JANITZ, THEODORE R. FRENCH, and TERRY D. STINSON,<br><br>Defendants. | Civil Action No. 02-190S |
| LESLIE TURBOWITZ, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>TEXTRON, INC., LEWIS B. CAMPBELL, JOHN A. JANITZ, THEODORE R. FRENCH, and TERRY D. STINSON,<br><br>Defendants. | Civil Action No. 02-264S |

# APPENDIX OF EXHIBITS IN SUPPORT OF PLAINTIFFS' MOTION FOR LIMITED RECONSIDERATION AND MEMORANDUM IN SUPPORT THEREOF

William M. Kolb, Esq. #3664
Kaplan & Kolb Inc.
1100 Turks Head Building
Providence, RI 02903

Plaintiffs' Liaison Counsel

Ira M. Press, Esq.
Mark A. Strauss, Esq.
Kirby Mcinerney & Squire, LLP
830 Third Avenue
New York, NY 10022

Michael I. Behn, Esq.
Ronald L. Futterman, Esq.
Futterman & Howard, Chtd.
122 S. Michigan Ave., # 1850
Chicago, IL 60603

Plaintiffs' Co-Lead Counsel

Kirk Chapman
Milberg Weiss Bershad
Hynes & Lerach LLP
One Pennsylvania Plaza
49th Floor
New York, NY 10019

Date: May 24, 2005

# EXHIBITS

Ex. A. May 10, 2005 Memorandum and Order Granting in Part and Denying in Part Plaintiffs' Motion to Compel Production of Documents.

Ex. B. April 15, 2005 Transcript of Hearing on Motion to Compel.

Ex. C. Excerpts from September 11, 2003 Corrected Consolidated Amended Class Action Complaint for Violations of Federal Securities Laws.

Ex. D. January 19, 2001 Correspondence from Chief Administrator of V-22 contracts to Bell president.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| JOEL ROSEN, Individually and on Behalf of All Others Similarly Situated<br><br>v.<br><br>TEXTRON, INC., LEWIS B. CAMPBELL, JOHN A. JANITZ, THEODORE R. FRENCH, and TERRY D. STINSON | C.A. 02-190S |
| LESLIE TURBOWITZ, Individually and On Behalf of All Others Similarly Situated<br><br>v.<br><br>TEXTRON, INC., LEWIS B. CAMPBELL, JOHN A. JANITZ, THEODORE R. FRENCH and TERRY D. STINSON | C.A. 02-264S<br><br>**CORRECTED CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS** |

**JURY TRIAL DEMANDED**

William M. Kolb, Esq.
KAPLAN & KOLB INC.
1100 Turks Head Building
Providence, RI 02903
(401) 272-9000

Plaintiffs' Liaison Counsel

Ira M. Press, Esq.
Mark A. Strauss, Esq.
KIRBY McINERNEY & SQUIRE, LLP
830 Third Avenue, 10th Floor
New York, NY 10022
(212) 371-6600

Ronald L. Futterman, Esq.
Michael I. Behn, Esq.
FUTTERMAN & HOWARD, CHTD.
122 South Michigan Avenue
Suite 1850
Chicago, Illinois 60603
(312) 427-3600

Plaintiffs' Co-Lead Counsel

Dated: SEPTEMBER 11, 2003

RECORDED AS COSTS ARE INCURRED. REVENUES UNDER THE V-22 PRODUCTION CONTRACT WITH THE U.S. GOVERNMENT . . . ARE RECORDED AS COSTS ARE INCURRED.

CERTAIN CONTRACTS ARE AWARDED WITH FIXED-PRICE INCENTIVE FEES. INCENTIVE FEES ARE CONSIDERED WHEN ESTIMATING REVENUES AND PROFIT RATES, AND ARE RECORDED WHEN THESE AMOUNTS ARE REASONABLY DETERMINED. LONG-TERM CONTRACT PROFITS ARE BASED ON ESTIMATES OF TOTAL SALES VALUE AND COSTS AT COMPLETION. SUCH ESTIMATES ARE REVIEWED AND REVISED PERIODICALLY THROUGHOUT THE CONTRACT LIFE. REVISIONS TO CONTRACT PROFITS ARE RECORDED WHEN THE REVISIONS TO ESTIMATED SALES VALUE OR COSTS ARE MADE. ESTIMATED CONTRACT LOSSES ARE RECORDED WHEN IDENTIFIED.

61. The Financial Acquisition Regulations ("FAR") published by the U.S. government, setting forth the accounting rules that must be followed by DoD contractors, also required that Textron accurately track, monitor and appropriately revise revenue, cost, and profit estimates on a regular and consistent basis. FAR 215.811-74 provides, in pertinent part, that "[t]o be considered adequate, a contractor's estimating system must be established, maintained, reliable, consistently applied, and must produce verifiable, supportable and documented cost estimates."

62. In addition, federal contracts ordinarily require contractors to provide management reports setting forth cost and other data so that government systems managers can evaluate contract performance and identify potential or actual problems that might have a significant cost impact. Textron's V-22 project was no exception. Defendants prepared and provided periodic reports setting forth such data to the DoD so that government systems managers could evaluate Textron's V-22 contract performance and identify potential or actual problems that might have a significant cost impact on the V-22 project.

the required accounting adjustments had not, in fact, been made, and in that the failure to make such accounting adjustments was not disclosed.

66. On April 8, 2000, prior to the Class Period, a clear indication of a dangerous structural problem in the design of the V-22 relevant to defendant's Class Period accounting estimates, came to light when a V-22 crashed at an airbase near Tucson, Arizona. The aircraft had been attempting a landing when it abruptly rolled over and smashed nose-first into the tarmac, killing 19 Marines. All further V-22 test and training flights were grounded for months thereafter pending investigation. On July 27, 2000, the Marine Corps. issued a report stating that the cause of the crash was the V-22's tendency to roll over when it descended rapidly in helicopter mode at low forward speeds, or "vortex ring state" ("VRS"). VRS occurs when a rotor craft (helicopter) descends into its own turbulence. The rotor system is then processing the same air continuously and does not produce enough lift to keep hovering.

67. Critics noted that when a helicopter enters vortex ring state, the pilot usually can easily escape by dipping the craft's nose down and flying out of the column of disturbed air. The V-22, however, behaved differently, as the Marine Corps learned on April 8, 2000: It quickly rolled over on its back, and crashed.

68. Following the April 8, 2000 crash, the Navy grounded the V-22 for two months pending an investigation and issued strict orders to V-22 pilots to limit their rates of descent.

69. After the April 8 crash and before the Class Period, a series of non-public communications (obtained during counsel's investigation) show that defendants were well aware of undisclosed serious problems with the V-22, that would increase program costs due to needed design changes and extended schedules. In a series of meeting and e-mails, General Dennis Krupp, the Commanding General over the V-22 programs, criticized Bell's management. For example, on

August 7, 2000, General Krupp e-mailed the Bell site manager for the program. General Krupp told Bell management that he was "extremely disappointed with the support provided" by the contractor. In particular, he stated that it was unacceptable that, out of five new aircraft, only one was able to fly. (See December 11, 2001 Inspector General Report which is publicly available and is incorporated herein by reference).

70. On August 15, 2000, the DoD Office of the Inspector General released an audit report on the V-22 program, identifying 22 "major" deficiencies in "operational effectiveness and suitability requirements" of the aircraft which the Inspector General determined were impossible to correct and test before December 2000, the date set for deciding whether the V-22 would go into full-rate production. According to a Bloomberg News report that same day, the Navy reacted by saying that "[t]he aircraft, developed by Textron Inc. and Boeing Co., will meet all requirements when the U.S. Defense Department decides later this year whether to approve full production worth as much as $19 billion." Defendants issued no public comment.

71. That public confidence was not reflected in closed-door sessions. On August 29, 2000, General Krupp convened a meeting with his top staff, and others in Bell management, including the Bell-Boeing V-22 Program Director, Robert Wilman, and the Bell-Boeing Site Manager. At that meeting, General Krupp chastised Bell/Boeing for failing to provide adequate support to the Osprey program. The next day, on August 30, 2000, Program Director Wilman e-mailed a summary of General's Krupp's admonition to Bell's senior management and others. (See December 11, 2001 Inspector General Report)

72. On September 25, 2000, General Krupp was informed that no V-22 aircraft were fully mission capable, making it a virtual certainty that full scale development of the aircraft

would not proceed as planned, and that the development schedule would need to be extended. (See December 11, 2001 Inspector General Report)

73. On October 10, 2000, John Murphey, the President of Bell Helicopter Textron, sent an internal memo to Bell Employees reporting "a critical planning session" he had convened with top management. Murphey candidly admitted, internally, that Bell was "clearly not meeting the expectations of our customers." The memo further recognized reliability and other "field related problems that have troubled our customers."

74. On October 12, 2000, Lieutenant General Frederick McCorkle, Deputy Commandant of the Marine Corps for Aviation – the number 2 position in the Marines – e-mailed Murphey, along with other Bell senior managers and military officers to discuss the findings that would soon be published by Philip E. Coyle, the Pentagon's director of operational test and evaluation. As further detailed below, Coyle concluded that the V-22 was not operationally suitable. Murphey was also informed that only one of the seven Ospreys was functioning at the time, and that "we don't show much improvement." (See December 11, 2001 Inspector General Report)

75. On October 13, 2000, Bell President Murphey met with General McCorkle to discuss the critical problems Coyle and others had identified. The discussion included the seriously deficient readiness rates, and the effect those rates would have in delaying production schedules.

76. General McCorkle remained surprised and angered that Bell/Boeing and the remainder of the team had still not made progress. By e-mail of October 17, 2000, he told Bell management that "I thought we had already pulled out all the stops. If we have not then I am truely disappointed [sic]. I had a meeting almost two months ago with personnel with your office regarding the abysmal readiness of the MV-22. . . ." In an interview during the Department of Defense Inspector General investigation (released after the Class Period), Marine Commanding General

Krupp expressed his belief that "the Bell-Boeing folks were asleep." (See December 11, 2001 Inspector General report)

77. The Class Period began on October 19, 2000, the date the Company announced its financial results for the third quarter of 2000. As the market digested this announcement, which was materially false and misleading for the reasons set forth below, Textron stock was propelled from $43.37 per share to $55.37 per share on November 7, 2000.

78. On November 17, 2000, Philip E. Coyle, the Pentagon's director of operational test and evaluation, issued a Combined Operational Test & Evaluation And Live Fire Test & Evaluation Report on the V-22 Osprey. The report which was the result of extensive investigation by the Pentagon's top weapons tester, was hundreds of pages long, and included information known to defendants before the Class Period. The full text of the report is publicly available, and it is incorporated herein by reference.

79. In his report, Coyle wrote that the V-22 was "not operationally suitable" because many questions remained about the aircraft's reliability and maintenance and its poor logistics and supply system. Coyle said that the aircraft passed operational tests only because "significant" requirements were waived, and that the aircraft had proven so unreliable that it would become an "unacceptable burden" to the rest of the fleet.

80. The report said that the V-22 probably would not be able to conduct military missions without significant maintenance problems and that it had a worse reliability record than the 36-year-old helicopter that it was intended to replace. In particular, Coyle reported that the Marines' V-22s were ready to fly only 57 percent of the time under the most favorable circumstances. That compared with the 79 percent readiness rate of the Marine's Viet-Nam conflict-era CH-46 helicopter

Earlier this month, Marine Corps officials announced that the MV-22 Osprey has been judged operationally suitable for land-based operations, validating eight months of comprehensive evaluation and moving the tiltrotor a major step closer to full-rate production. Bell remains on track to deliver eight V-22 tiltrotors this year. The current total requirement among Marines, Navy and Air Force is for 458 V-22 Ospreys for production through 2014.

-- Textron's Aircraft Segment expects full-year ROIC [return on invested capital] improvement of 200-250 basis points to the 17% level this year.

127. As reported in the October 20, 2000 Fort Worth Star-Telegram, "Textron didn't break out the financial figures for Bell Helicopter but said the manufacturer was enjoying a gradually improving commercial helicopter environment." With attribution to a corporate spokeswoman, the report noted that corporate efforts "to cut costs and maintain profitability" were not required at Bell operations. In addition, "Textron reported its 44th consecutive quarterly increase in net income."

128. With regard to the Company's 2000 and 2001 outlook, the release stated:

The Company now expects full-year 2000 earnings per share will be within the range of $4.65 to $4.68, reflecting a full-year increase in earnings per share of approximately 15% before possible restructuring charges that may be taken during the fourth quarter. Textron estimates 2001 earnings will be up 13% to 15% before restructuring charges that may be taken in 2001.

129. The foregoing statements were each materially false and misleading when made in that they misrepresented and/or omitted adverse facts which then existed and the disclosure of which was necessary to make the statements made not false and/or misleading, including, without limitation, that:

(a) Notwithstanding that Textron's monitoring and tracking systems made clear to defendants that the V-22 and H-1 contracts would suffer from materially increased costs, reduced profitability and delayed schedules, the Company failed to make appropriate adjustments in

its accounting, thus resulting in overbooked income and a failure to recognize appropriate losses in the Company's financial statements;

(b) The earnings release and quarterly financial statement falsely implied that all appropriate accounting adjustments had already been made to account for the increased costs of and delays in production of the V-22, when, in fact, precisely the opposite was true;

(c) Although defendants represented that Textron's financial reports when issued were prepared in conformity with GAAP, they were not prepared in conformity with the GAAP, for the reasons set forth fully below;

(d) The V-22 suffered from structural and design defects which required a complete redesign and retesting of the tiltrotor technology and other aspects of the aircraft and this would significantly delay the production schedule and add to the V-22 program's costs, thereby further reducing overall revenue and income, contrary to the Company's bullish forecast; and,

(e) Contrary to the assertion of defendant Campbell, the V-22 was not "on track" but rather, production was subject to substantial delays due to the need for costly and time consuming redesign and retesting of fundamental aspects of the aircraft;

(f) Based on the foregoing, defendants lacked a reasonable basis for the financial reporting referred to above, and the projection that Textron's 2001 earnings would be up 13% to 15% before restructuring charges.

130. On November 13, 2000, Textron filed with the SEC its Form 10-Q for the quarter ended September 30, 2000, signed by R.L. Yates, Textron's Vice-President and Controller ("Yates"). Textron announced diluted earnings per share from continuing operations of $1.08 per share (up 14% from the $0.95 per share reported for the third quarter of 1999), and income from continuing operations of $158 million (up 8% from $146 million reported for the third quarter of

**That the Fraud Involved Core Operations of Textron Which Defendants Had a Duty to, and Did, Monitor, Establishes a Strong Inference of *Scienter***

203. The fraud in this case did not arise from peripheral operations of Textron, nor was it instituted by lower level employees or otherwise hidden from the members of Textron top management sued as the Individual Defendants herein. To the contrary, the misrepresentations and omissions complained of herein concerned Textron's core projects – the V-22 and H-1 – which were vital to the prospects of the Company. Knowledge concerning a company's core operations are attributable to the Company and to the Individual Defendants as officers and directors.

204. Indeed, Individual Defendants Campbell, French, and Janitz were, respectively, the Chairman of the Board of Directors and CEO, Executive Vice-President and CFO, and President and Chief Operating Officer of Textron. Individual Defendant Stinson was the Chairman of the Board of Directors and CEO of Bell Helicopter Textron. All of the Individual Defendants were intimately involved and had direct responsibility with respect to important issues affecting Textron's business, operations, performance, and prospects, such as the performance of its subsidiaries and the subsidiaries' contribution to Textron's earnings (including the V-22 Osprey contract, which Defendants characterized as essential to Textron's future prospects). In addition, French in his position as the CFO was intimately involved in the accounting and financial reporting functions of Textron, including the determination of accounting estimates.

205. As indicated above, GAAP, FAR, Textron's own stated accounting policies, and the terms of the V-22 and H-1 contracts, each required Textron to have systems in place to monitor and to track the factors affecting accounting estimates and to render and revise such estimates on a reliable, consistently applied, verifiable and ongoing basis. Under GAAP and other applicable accounting requirements, the accuracy of estimates is a major issue for companies using

percentage-of-completion contract accounting, and occupies significant management attention. The Company and each of the Individual Defendants, as top officers and directors of the Company, were responsible for and devoted substantial attention to the reliability of the Company's system of determining accounting estimates and to the estimates that were generated and used to prepare the Company's financial statements.

206. Textron in fact had in place extensive internal systems designed to identify and quantify estimate problems. According to a March 2001, internal presentation by David Moorman, Program Manager of the joint Bell-Boeing team developing the V-22, the Company had developed internal systems which provided "[a] method for providing management insight into program cost and schedule performance on a weekly basis." More specifically, defendants had in place what was called a "disciplined cost/schedule process," which provided an "[e]arly warning of potential problems" and "continuous management and increased awareness of cost/schedule issues." On a weekly basis, defendants and each of them, kept track of actual costs of work performed ("ACWP") and budgeted costs of work performed ("BCWP") for each of Textron's contracts, including the V-22 and H-1. The Company also tracked weekly Schedule Performance Indices ("SPI") and Cost Performance Indices ("SPI"). These were also analyzed weekly for trends and "root cause analysis" and reported to top management, including the Individual Defendants.

207. Furthermore, according to the August 20, 2000 issue of "Osprey Facts," a newsletter published to the V-22 "community" by Bell-Boeing, Bell-Boeing had formed a "Cost Reduction Affordability Team" specifically to track V-22 costs in order better to evaluate cost estimates. As the article stated, "a Bell-Boeing-government Cost Reduction Affordability Team (CRAfT) was established in January 2000 to provide a mechanism for collecting and implementing Cost Reduction Initiatives (CRI) using a methodology similar to the successful cost reduction efforts

on the Air Force C-17 and F-22 programs." The newsletter also stated that, to date, "the Bell-Boeing team has identified some 437 CRIs" and that "[t]he intent of the CRAfT is to make cost reduction an on-going effort for the duration of the V-22 program. Objectives of the CRAfT are as follows: . . . Facilitate the development of a joint cost model which results in annual V-22 cost estimates based on joint government/contractor agreed-to factors, assumptions, and CRIs."

208. Textron and the Individual Defendants thus had knowledge and/or access to and a duty to monitor, the foregoing information concerning the formulation of the Company's accounting estimates with respect to the V-22 and H-1 programs. Such information was regularly circulated to defendants as part of internal management reports provided and/or was accessible to defendants on Textron's computer system. In addition, Textron was required to, and did, prepare and provide to the DoD periodic reports setting forth cost and other data in order for the DoD to evaluate such estimates. The Individual Defendants participated in the preparation and/or had access to and a duty to monitor such periodic reports.

**The Abrupt Departures of Defendants Janitz and Stinson,**
**<u>Establish a Strong Inference of *Scienter*</u>**

209. A strong inference of <u>scienter</u> is also established by the timing of the abrupt departures of defendant Janitz as Textron Chief Operating Officer and of defendant Terry Stinson as Chief Executive Officer of Bell. Their departures coincided with the September 26, 2001 announcement finally recognizing the V-22 and H-1 losses. This provides strong circumstantial evidence that these executives were ousted because of their knowing or reckless disregard of the falsity of the accounting estimates used to prepare Textron's financial statements during the Class Period. Defendants Janitz and Stinson were Bell-division executives who had fought their way to the top and desired to keep their top level jobs. Textron's shareholders and top management were focusing on their ability to deliver strong financial performance, especially due to the Company's

DEFENSE CONTRACT MANAGEMENT AGENCY
DEFENSE CONTRACT MANAGEMENT
BELL HELICOPTER TEXTRON
~~P.O. BOX 1605~~
FORT WORTH, TEXAS 76101-1605

IN REPLY REFER TO DCMDW-RKT

January 19, 2001

Mr. [redacted]
President
Bell Helicopter Textron, Inc. (BHT)
P. O. Box 482
Fort Worth, TX 76101-0482

Dear [redacted]:

The attached letter from the DCMA Earned Value Management (EVM) Center recommends withdrawal of Bell Helicopter's current EVM System validation. Based on continued customer concern with BHT's performance data integrity and program management's usage, I agree that withdrawal of the current EVM System Validation is warranted. However, in order to provide BHT an opportunity to maintain system validation, BHT is hereby authorized 15 days from the date of this letter to submit a Plan which satisfies the 32 EVM System criteria and assures that BHT is committed to using EVMS as part of their integrated management. At a minimum the Plan must include identifiable and measurable milestones in addressing the 32 EVM system criteria and BHT's commitment to utilize EVMS as a management tool. Failure to provide an approved Plan within 15 days of this letter will cause BHT's EVM System validation to be withdrawn. This Plan, once approved, must be implemented and BHT must provide documented evidence that it is tracking to the planned milestones within 45 days of this letter.

If you have any questions or require additional information please call me at x7243.

DANIEL SALAS
Divisional Administrative Contracting Officer

Attachment

Cc:
DCMDW/P. Landini
DCMAC/S. Krivokopich
DCAA BHTI
DCMDW-RKD
DCMDW-RKOA, RKOB

**Certificate of Service**

I hereby certify that on the 1st day of June, 2005, true and accurate copy of the attached APPENDIX OF EXHIBITS IN SUPPORT OF PLAINTIFFS' MOTION FOR LIMITED RECONSIDERATION AND MEMORANDUM IN SUPPORT OF THEIR MOTION FOR LIMITED RECONSIDERATION, was served by first class mail, postage prepaid, upon the following:

John A. Tarantino, Esq.
Paul V. Curcio, Esq.
Adler Pollock & Sheehan P.C.
One Citizens Plaza, 8th Floor
Providence, RI 02903

Mitchell A. Karlan, Esq.
Aric H. Wu, Esq.
Anthony J. Mahajan, Esq.
Gibson, Dunn & Crutcher LLP
200 Park Avenue
New York, New York 10166

W. Antriose

UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

JOEL ROSEN, et al. :
:
v. : C.A. No. 02-190S
:
TEXTRON, INC., et al. :

MEMORANDUM AND ORDER

Before this Court is Plaintiffs' Motion to Compel Production of Documents (Document No. 76). This Motion has been referred to me for determination. 28 U.S.C. § 636(b)(1)(A); Local Rule 32(b). A hearing was held on April 15, 2005. As specifically set forth below, Plaintiffs' Motion is GRANTED in part and DENIED in part.

**Background**

This is a consolidated securities fraud class action brought by and on behalf of purchasers of Textron, Inc. ("Textron") common stock between October 19, 2000 and September 26, 2001 (the "Class Period"). Plaintiffs' Motion for Class Certification has not yet been decided by the Court. On June 15, 2004, District Judge William Smith, applying the heightened pleading standard of the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4(b), denied Defendants' Motion to Dismiss Plaintiffs' Amended Complaint. Rosen v. Textron, Inc., 321 F. Supp. 2d 308 (D.R.I. 2004). However, in denying Defendants' Motion, Judge Smith ruled that Plaintiffs had failed to allege sufficient facts to state a claim for securities fraud as to certain allegations related to the "H-1" upgrade contract and the Omniquip acquisition.

Following Judge Smith's ruling on the Motion to Dismiss, he issued a Discovery Scheduling Order (the "Order") which required Defendants to produce certain documents (1) "relating to the

accounting adjustment made by Textron in the third quarter of fiscal year 2001 concerning the V-22 program" and (2) "relating to Textron's accounting for the V-22 program (including operational documents) during fiscal year 2000 and the first three quarters of fiscal 2001." (Document No. 53). The Order also permitted Plaintiffs to serve a further document production request upon Defendants after receiving the documents described above but not later than December 15, 2004.

On December 15, 2004, Plaintiffs served a Request for Production of Documents on Defendants consisting of thirty-two individual requests excluding subparts. On January 4, 2005, Defendants responded with general objections and specific objections to each of the thirty-two requests. The parties remain in dispute as to thirteen of the requests (Nos. 4, 11, 12, 14-16, 18, 20, 21, 23-25 and 32).

## Discussion

### A. Defendants' General Objection No. 1

A fundamental dispute exists between the parties regarding the scope of document discovery set by Judge Smith's Order. (Document No. 53). Not surprisingly, Defendants argue for a narrow reading and Plaintiffs argue for a broad reading. Defendants assert:

> The Court fixed the scope of document discovery provided in Paragraphs 1 and 2 of the...Order, and contemplated that that would constitute the vast bulk of defendants' document production. Paragraph 7 of the...Order was added for the limited purpose of allowing plaintiffs to serve *discrete* requests, requesting specific documents that the plaintiffs believed had been omitted from the initial production.

Defs.' Objections to Pls.' Req. for Produc. of Docs., p. 1

Plaintiffs argue that paragraph 7 was not intended to limit Plaintiffs' discovery rights under Fed. R. Civ. P. 34 in any way.

This Court does not interpret paragraph 7 of Judge Smith's Order as a limiting or protective order. See Fed. R. Civ. P. 26(c). Rather, this Court considers paragraphs 1 and 2 of the Order to be analogous to initial disclosures under Fed. R. Civ. P. 26(a)(1) simply intended by Judge Smith to get the "ball rolling" on discovery in an orderly and efficient fashion. Paragraph 7 of the Order contains none of the limitations on scope suggested by Defendants. In fact, the only limitations contained in paragraph 7 of the Order relate to the timing of Plaintiffs' document production request – after receiving documents from Defendants under paragraphs 1 and 2, but "by December 15, 2004." Thus, Plaintiffs' Motion will be decided applying the general discovery parameters provided under Fed. R. Civ. P. 26.

**B. Request No. 4[1] (Analysis of Stock Price)**

"Plaintiffs allege that persons who bought Textron stock during the Class Period paid an artificially inflated price." Rosen v. Textron, 321 F. Supp. 2d at 311. Thus, Plaintiffs argue they are entitled to discover internal communications and other documents discussing what factors moved, or were believed by Defendants to move, the price of Textron stock. Defendants contend that Plaintiffs already have documents breaking down the September 26, 2001 accounting adjustment and that there are no documents in existence evaluating the relationship between the V-22 program and Textron's stock price.

Since Defendants will likely defend this case, in part, by arguing that factors other than the V-22 program and the 2001 accounting adjustment caused the stock price movement during the Class Period, Plaintiffs are entitled to discover information regarding what Defendants were saying

[1] In addition to lengthy general objections, Defendants object individually to each of the requests in dispute as "vague, ambiguous, overbroad, and unduly burdensome," and "not reasonably calculated to lead to the discovery of relevant or admissible evidence."

internally and to the public regarding the actual and/or anticipated reasons for stock price movements during the Class Period. Thus, Defendants' objections are overruled, and Plaintiffs' Motion to Compel as to Request No. 4 is GRANTED except Plaintiffs' "Relevant Time Period" is restricted to the "Class Period."

**C. Request No. 11 (Key Document Discovery)**

This request lists eight so-called "key documents" which are already in Plaintiffs' possession and were provided to the Court as part of a Joint Appendix submitted in connection with Defendants' Motion to Dismiss. Plaintiffs are seeking drafts, responses, comments, reactions, notes, etc., concerning the key documents. Defendants argue that Plaintiffs already have copies of these documents and that Plaintiffs are not entitled to discovery regarding Defendants' reaction to these documents because they "already have produced documents that had any bearing on the accounting for the V-22."

Defendants' argument on this request is both confusing and unconvincing. Defendants simply do not directly address Plaintiffs' request or their arguments. Since the request is confined to documents concerning "key documents" in this case, Defendants' objections are overruled, and Plaintiffs' Motion to Compel as to Request No. 11 is GRANTED.

**D. Request No. 12 (Government Funding)**

Plaintiffs argue they are entitled to documents regarding Government funding for the V-22 program because they allege that "defendants inflated the revenues and profits for the V-22 program." Defendants counter that this is not a cost overrun case and that they have already agreed to produce, or have produced, documents concerning costs or schedules associated with the V-22 program and have produced a "Contract Value/Funding Status Report" relating to the V-22 program.

In reviewing Plaintiffs' allegations, Judge Smith recognized that they "stem" from the September 26, 2001 accounting adjustment. He described Plaintiffs' claims as alleging that Defendants had "detailed knowledge" of the V-22 program setbacks and intentionally delayed in making profit estimate adjustments to conform to GAAP. There is nothing in Judge Smith's decision to indicate that the adjustments were related to funding issues. Rather, he stated "the Plaintiffs contend that the September 26, 2001 accounting adjustments should have been made in October 2000 when the Defendants became aware that additional costs and production setbacks would affect the Osprey Program." 321 F. Supp. 2d at 315 (emphasis added). Thus, Defendants' objections are sustained, and Plaintiffs' Motion to Compel as to Request No. 12 is DENIED.

**E. Request No. 14 (Executive Compensation)**

Plaintiffs seek documents concerning the compensation of the Individual Defendants (Campbell, Janitz and French) and Bell Helicopter President Murphey who is not a defendant. Plaintiffs argue that such discovery is relevant to scienter, citing Aldridge v. A.T. Cross Corp., 284 F.3d 72 (1st Cir. 2002). In Aldridge, the Court held that executive financial incentives that "go far beyond the usual arrangements of compensation based on the Company's earnings" may be considered among other facts to show scienter. 284 F.3d at 83.

While Defendants correctly point out that such evidence alone is not enough to establish scienter, Defendants have not otherwise convinced this Court that Plaintiffs should be precluded from this line of discovery in view of the Aldridge case. On the other hand, Plaintiffs have not established the relevance of such discovery as to Bell Helicopter President Murphey – a non-party to this litigation. Thus, Defendants' objections are overruled as to the Individual Defendants and

sustained as to Murphey. Plaintiffs' Motion to Compel as to Request No. 12 is GRANTED for the Individual Defendants and DENIED for Murphey.

**F. Request No. 15 (Executive Terminations)**

Plaintiffs seek documents concerning the termination of Textron President Janitz and Bell CEO Stinson. Janitz is an Individual Defendant. Stinson has been dismissed as a Defendant by Judge Smith. Citing Aldridge, Plaintiffs argue that an executive's self-interested motivation to save his job may be evidence of scienter. See also Greebel v. FTP Software, Inc., 194 F.3d 185, 196 (1st Cir. 1999).

Again, based on Aldridge, Plaintiffs have established relevance as to documents concerning the termination of Defendant Janitz as they in any way relate to, or concern, the V-22 program. Plaintiffs have not, however, established relevance as to the termination of former Defendant Stinson. Judge Smith dismissed this case as to Stinson because "Plaintiffs fail[ed] to assert that he participated in the allegedly fraudulent accounting practices" and Stinson was never a Textron officer during the Class Period. Thus, Defendants' objections as to Stinson are sustained and as to Janitz are overruled except that production is narrowed as noted above. Plaintiffs' Motion to Compel as to Request No. 15 is DENIED as to Stinson and GRANTED as to Janitz but only for termination documents that in any way relate to or concern the V-22 program.

**G. Request No. 16 (V-22 Operational Documents)**

Plaintiffs seek documents concerning the operational effectiveness, suitability, or safety of the V-22 program aircraft. Defendants argue that the request is "extremely broad" and that they have already produced "operational" documents related to Textron's accounting for the V-22 program.

Although this Court agrees that the request is somewhat broad, it is also limited by the "Relevant Time Period" of Plaintiffs' request – January 1, 2000 through September 30, 2001. At the hearing, Defendants' counsel described his clients' position as a "burdensomeness and minimal relevance objection" which would unnecessarily require production of the time records of workers. In other words, Defendants appear to argue that "the burden or expense of the proposed discovery outweighs its likely benefit." See R. Civ. P. 26(b)(2).

Plaintiffs correctly argue that the 2001 accounting adjustment cannot be examined in an accounting vacuum. The percentage-of-completion accounting method utilized by Textron requires ongoing monitoring and review of progress on the contract "in order to make accurate estimates of total contract cost, total contract revenues, and the extent of progress toward contract completion." 321 F. Supp. 2d at 314-15. This accounting method necessarily involves an assessment of the operational status of the contract. Thus, Defendants' objections are overruled, and Plaintiffs' Motion to Compel as to Request No. 16 is GRANTED subject, however, to the following condition. Plaintiffs shall serve an amended Request No. 16 on Defendants which targets and more particularly identifies the specific documents sought and/or the specific documents not sought (such as employee time cards).

**H. Request No. 18 (V-22 Program Full-Rate Production)**

Plaintiffs seek documents regarding full-rate production for the V-22 program. Defendants assert that such documents are not relevant because there was never a full-rate production contract, and they have produced documents confirming that the 2001 accounting adjustment related solely to the V-22 program EMD contract.

Although Defendants correctly point out that there was never an actual full-rate production contract, Judge Smith's Ruling on the Motion to Dismiss did not isolate Plaintiffs' claims, at least at this stage of the litigation, to the EMD contract. Judge Smith held that "the alleged fraud involves the impact that delays in reaching full-rate production had on Textron's accounting for its existing contracts." 321 F. Supp. 2d at 324. He also did not resolve at this stage the factual question as to "[w]hether the required accounting adjustments related only to development contracts or to full-rate production (or both)." Id. While Defendants may disagree with Judge Smith's conclusions in this regard, this Court must look to his ruling for guidance in sorting through this pending Motion to Compel. Thus, based on Judge Smith's findings noted above, Defendants' objections are overruled, and Plaintiffs' Motion to Compel as to Request No. 18 is GRANTED.

**I. Requests Nos. 20 and 21 (Governmental Investigations)**

Plaintiffs seek various documents regarding Governmental investigations or audits concerning the V-22 program. The parties' arguments have a familiar ring. Plaintiffs say the issue is what Defendants knew and when they knew it. In other words, they argue they need these documents to establish when Defendants were on notice as to the V-22 program problems. Defendants say there was never an investigation into the "accounting" for the V-22 program and Plaintiffs already have the Government reports.

Even though Plaintiffs may already have the Government reports, they argue convincingly that internal documents evidencing Defendants' reaction to, or awareness of, such Government findings, and documents from Defendants to the Government regarding such findings are relevant. Plaintiffs have not, however, made a convincing showing as to the relevance of such documents concerning the so-called "falsification scandal" since there is no allegation that it involved

Defendants, or any Textron employees for that matter. Thus, Defendants' objections are sustained only in part and otherwise overruled. Plaintiffs' Motion to Compel as to Request No. 20 is DENIED and as to Request No. 21 is GRANTED.

**J. Requests Nos. 23 and 24 (Other Litigation)**

Plaintiffs seek various documents from other litigation involving the V-22 program. Plaintiffs argue that such information may include statements Defendants and other key witnesses may have made about the V-22 program in those cases. Defendants contend that the request does not seek relevant information because there has been no parallel litigation about the "accounting" for the V-22 program and also that the request is objectionable because it seeks public records to which Plaintiffs have independent access.

Defendants are correct that they should not be required to produce documents which Plaintiffs can themselves obtain from the public domain. However, some of the proceedings identified in the request, such as arbitrations, may not be in the public domain and some of the documents identified in the request, such as deposition transcripts and discovery responses, may not be in the public domain. However, Plaintiffs' request is overbroad given Plaintiffs' indication that they are seeking statements "concerning when Defendants knew or should have known that design and schedule changes were necessary." Thus, Defendants' objections are sustained, but only in part, and Plaintiffs' Motion to Compel as to Requests Nos. 23 and 24 is GRANTED in part. Defendants shall provide Plaintiffs with a listing of such "parallel litigation" pending at any time during the Class Period with sufficient identifying information such as case name, forum, case number, filing date, etc. In addition, Defendants shall produce any documents containing sworn statements or testimony of the Individual Defendants in such litigation.

**K. Request No. 25 (Systems Information)**

Plaintiffs seek documents regarding systems used for estimating and monitoring costs and schedules (including the Earned Value Management System ("EVMS")), as well as documents regarding Government inquiries, reviews, etc. concerning the EVMS. Defendants argue that since they have provided Plaintiffs with the underlying data produced by these systems, Plaintiffs have no need for discovery regarding the systems themselves.

Plaintiffs repeatedly argue in connection with their Motion to Compel that they need various documents in order to prove "what defendants knew and when they knew it." Rather than focusing on what Defendants knew and when, this Request focuses more on how they knew it and/or what they did not know. Thus, Defendants' objections are sustained and Plaintiffs' Motion to Compel as to Request No. 25 is DENIED.

**L. Request No. 32 (Document Retention)**

Plaintiffs seek documents concerning Textron's document retention policies and procedures. Defendants object arguing that Plaintiffs are not entitled to such documents because, as Plaintiffs concede, "there is no evidence of intentional misconduct here." See In re Honeywell Int'l, Inc. Sec. Litig., No. M8-85 WHP, 2003 WL 22722961 at *9 (S.D.N.Y. Nov. 18, 2003) (denying document retention policy discovery due to the lack of "a concrete basis" for the request). Likewise, Plaintiffs also have not articulated any "concrete basis" for their request in this case. Thus, Defendants' objections are sustained, and Plaintiffs' Motion to Compel as to Request No. 32 is DENIED.

For the reasons discussed above, Plaintiffs' Motion to Compel Production of Documents (Document No. 76) is GRANTED in part and DENIED in part. Defendants shall produce any responsive documents within thirty (30) days of the date of this ORDER.

Lincoln D. Almond
United States Magistrate Judge
May 10, 2005